(163 App. Div. 146)

CHERNEY v. LUDLUM STEEL & SPRING CO.     (No. 125–33.)

(Supreme Court, Appellate Division, Third Department. July 1, 1914.)

MASTER AND SERVANT (§ 278*)—ACTIONS FOR INJURIES—SUFFICIENCY OF EVIDENCE.

In an action for the death of an employé engaged in operating a steam hammer, due to the breaking of a tool used in cutting steel under a blow of such hammer, evidence as to the cause of the cutter breaking *held* insufficient to support a verdict for plaintiff.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.*]

Appeal from Trial Term, Rensselaer County.

Action by Bessie A. Cherney, as administratrix of Antone C. Cherney, deceased, against the Ludlum Steel & Spring Company. From a judgment on a verdict for plaintiff for $6,000, and an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Ainsworth & Sullivan, of Albany (Andrew J. Nellis and Charles B. Sullivan, both of Albany, of counsel), for appellant.

Thomas S. Fagan, of Troy, for respondent.

WOODWARD, J. Plaintiff's intestate was instantly killed while operating a 3,000-pound steam hammer in defendant's plant in Colonie, Albany county, on the 4th day of October, 1912; the accident being caused by the breaking of a tool known as a cutter under a blow of the steam hammer. The plaintiff's theory of the case, as stated in the brief, and as the jury must be deemed to have found, is that:

"The looseness of the machine and the imperfections noted and set forth in the complaint rendered and made the whole machine defective, unsafe, insecure, and dangerous for workmen using and employed at and about it, and this condition of the hammer and machine caused the blows of the hammer to be of such a nature on the cutter as to result in the breaking of the cutter, and the broken part of the cutter flew up and struck the said Antone O. Cherney over the right eye, crushing through his skull and killing him instantly while in the performance of his work and labors for the defendant." (Here the plaintiff recites the language in which the defendant admits the fact of the killing.) "The plaintiff then proves by evidence which is uncontradicted that this machine 'at uncertain intervals' and daily breaks cutters used in the operation of this machine. And the plaintiff also eliminates any carelessness or negligence on the part of her intestate from the case, which might be attributed to him if he had held the cutter at an angle or unevenly on the biscuit, by showing that in such event his hands and arms would be cut and injured, and that as a matter of fact his hands and arms were not in any way bruised or injured. And plaintiff has also shown in detail various defects of the machine, substantiating the allegations of her cause of action set up in the complaint. Thus the plaintiff has conformed to the requirements of her case and cause of action as set forth in the complaint, and there is no suggestion in the case, established by evidence and proof, of any other or different cause for the accident which resulted in the death of plaintiff's intestate. Stevens v. Stanton Co., 153 App. Div. 82–85 [137 N. Y. Supp. 1024]."

This is what the plaintiff claims in support of the judgment now under consideration, and it may be conceded that there is some testimony in the case which would have a tendency to establish that the steam hammer in use by the defendant on the 4th day of October, 1912, had at some time in 1909 and 1910 been more or less out of order, and that some of the bolts had at various times worked loose, even that some of the bolts were found to be loose on the morning of the day of the accident; but the case is entirely lacking in evidence to support a cause of action for negligence on the part of the defendant, for there is no proof whatever in support of the theory that the plaintiff's intestate was killed by reason of any defect which is suggested in the machine. Brought down to the time of the accident, there is no proof of how the accident actually happened, or, if there is any such proof, there are two theories either one of which might account for the accident, but neither of which, under the facts disclosed, would justify a verdict in favor of the plaintiff.

Taking the plaintiff's own evidence for it, this steam hammer had been in operation in the defendant's plant for at least three years prior to the accident. It was a heavy steam hammer, the drop weighing 3,000 pounds, and this hammer was used in producing commercial steel, and was incidentally employed in the forming up of scrap steel and iron in "biscuits" which were cut partially in twain so that when cold they could be broken up with a sledge hammer. This cutting was done by means of a crude cutter attached to a handle of steel, the whole tool being a trifle over six feet in length. The process was to heat up

the scrap, beat it into a solid mass by means of the steam hammer, and then the plaintiff's intestate would place the cutting end of the tool upon the biscuit and signal the boy who was operating the hammer, and the hammer would come down on the biscuit and indent it in such a manner as to nearly sever it into several portions. According to the plaintiff's evidence, during all of the time that this steam hammer was operated, these cutters were broken on an average of one or two a day, and the defendant's witnesses testified that they were broken at uncertain intervals, as often as once a month. There is no evidence that with this large breakage any one else was ever injured, or that there was any practical way of preventing such breakage, unless it might have been by making use of the precaution which the rules and usages of the defendant required, which was that when the cutter was used the hammer should be brought down the first time softly, so as to determine that the blade rested squarely upon the face of the biscuit, and then should be driven in by blows from the hammer in operation. But it must be obvious that a tool which was used in this crude work, upon billets formed up merely for preserving and saving the materials, and which was capable of cutting into the steel, would be subject to breakage when placed under a steam hammer of the weight of the one in question. Any slight unevenness in the surface, any momentary carelessness on the part of the man handling the tool, so that it did not receive the square blow of the hammer, would necessarily produce breakage; but the experience of the defendant in the operation of the plant did not justify it in anticipating that this breakage would result in killing a man who was standing at the end of the tool, over six feet away While some of the witnesses testified generally that the pieces flew in all directions when there was a breaking of one of these tools, there was no evidence that the pieces which flew ever reached a dangerous distance from the anvil under the hammer, and there was no evidence that it had ever been found dangerous in all the time that the hammer had been operated.

The plaintiff called witnesses who had worked upon this hammer two to three years before the accident, and these witnesses testified to looseness in the bolts, and various other alleged defects in the machine; but the evidence was undisputed that the machine had been torn down, the foundation rebuilt, and the same thoroughly overhauled in the meantime and as late as July, 1912, while the plaintiff's own witnesses testify that on the morning of the accident plaintiff's intestate sent word to the foreman or superintendent that two of the bolts were loose, and this appears to have been the only complaint he made, and there is no dispute of the defendant's witness that these bolts were tightened up in the morning, while the accident occurred in the evening about 8 o'clock. Testimony as to the condition of this steam hammer in 1910 is utterly valueless as bearing upon the conditions existing in 1912; the common intelligence of mankind knows that a steam hammer of the size of the one here under consideration could not have continued in operation under the conditions described in 1909 and 1910 down to 1912 and be in substantially the same condition; the machine could not possibly have been operated night and

day all that time and stood up, and if there were intervening repairs the evidence is worthless for any purpose. The plaintiff's whole case rests upon the hypothesis that the hammer, owing to defects in the machine, struck a twisting blow, causing the cutter to break and be thrown against the plaintiff's intestate's head; but the evidence does not disclose that the hammer did in fact strike a twisting blow on this occasion, nor is there any credible evidence in the case to sustain such a theory. It is practically an impossibility for a steam hammer of this weight to be operated unless the machine is standing plumb; it certainly could not be operated effectively if there was any appreciable play in the movement of the hammer otherwise than along the lines which it was designed to follow, yet the undisputed evidence is that this hammer was used in producing commercial steel immediately following the accident and that it was in perfect working order.

The defendant introduced evidence tending to show that the accident must have occurred by reason of the fact that the cutting blade was held at an angle with the biscuit, so that the blow of the hammer acted upon the blade like a lever, and the plaintiff claims to have met this theory by evidence that this would have injured the intestate's hands or arms. This, however, need not follow; it would depend entirely upon how the intestate was holding the handle. If the blade rested upon the biscuit, with the handle overbalancing it, and the intestate merely held the handle loosely in his hand, the blow might throw the handle up out of his hands without inflicting the slightest injury upon him, and this theory of the defendant's is so much more plausible—is so much more within the range of possibilities—that it is idle to contend that the jury were justified in holding that this accident was due to any neglect of duty on the part of the defendant in respect to this machine. There are some things so inherently impossible that a jury is not warranted in believing even direct testimony, but when to this is added a mere theory, with no direct evidence of the theory having operated, it is time for this court to interpose its power of reversing the judgment because the case is lacking in evidence to support the verdict. If there was some direct evidence that this hammer, weighing 3,000 pounds, running in grooves at the end of a rigid piston rod, had struck a deflecting blow, we might hesitate to hold that there was no evidence of the theory, but no one pretends to say that they saw any such freak in mechanics; but for the want of a better theory some testimony is adduced as to an alleged blow upon the cutter which it is claimed indicates a twisting blow, but this is so contrary to the reasonable probabilities of the case that it cannot be accepted where the triers of fact are free from prejudice or sympathy warping their judgment as practical men.

Plaintiff relies for authority upon the case of Stevens v. Stanton Construction Co., 153 App. Div. 82, 137 N. Y. Supp. 1024; but that case has no elements in common with this case, for it came within the scope of section 18 of the Labor Law (Consol. Laws, c. 31) and resulted from the collapse of a derrick which the evidence showed with reasonable certainty was due to negligence in reference to the fastening of a steel guy. In that case the derrick itself collapsed entirely,

killing the plaintiff's intestate. Here the machine was not one of the mechanical appliances contemplated by section 18 of the Labor Law, for it was not used in "the erection, repairing, altering or painting of a house, building or structure," but was a machine long in use and was not shown to have been in a dangerous condition by any evidence which could be reasonably expected to convince men who were intent only upon producing simple justice under the law.

The most favorable view to the plaintiff is that there were two possible theories upon which the accident could be accounted for, the one presented by the defendant being immeasurably more probable than that presented by the plaintiff, while in the Stevens v. Stanton Construction Co. Case there was only one possible result which could follow the breaking or slipping of the fastening of the guy.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to abide the event. All concur, except SMITH, P. J., who concurs in memorandum and votes for a dismissal of the complaint.

The findings that the accident was caused by the negligence of the defendant and that plaintiff's intestate was free from contributory negligence are disapproved of.

SMITH, P. J. (concurring). I concur with the opinion of Mr. Justice WOODWARD, and would only add to that the suggestion that the exhibits themselves are convincing proof to me that the cause of the accident was the failure of the intestate to hold the cutter far enough on to the iron that was being cut to prevent its being thrown back toward him when struck by the hammer. The cutter was apparently forced down into the near side of the iron, which would not have been possible had it been properly held squarely upon the iron. The accident would therefore seem to have been caused solely by the negligence of the plaintiff's intestate, and for that reason I advise that the judgment be reversed, and the complaint dismissed, and the finding by the court of such fact and a disapproval of the findings of fact that the accident was caused by the negligence of the defendant and that plaintiff's intestate was free from contributory negligence.